1036 v. Compass Minerals OK, Mr. Grabo. Good morning. Morning, your Honor. May it please the Court. Jeremy Grabo for QBE Syndicate 1036. I believe I've reserved three minutes for rebuttal. This case presents a question of a statutory interpretation under the Louisiana Oil Field Anti-Indemnity Act, specifically whether that act applies to salt mines in Louisiana where the drill and blast mining method is used. That's a question of first impression that's not been decided. And why shouldn't it just be certified to the Louisiana Supreme Court? I mean, it's just a pure question of law would make a good law school final exam question. I mean, the Court has discretion to do that. Of course, the Court decides questions of state law all the time, making eerie guesses and similar predictions under the civilian tradition. So we think the district court, in this case, reached the issue and decided it. And we think this court should address it and decide it as well. The act was enacted to protect local Louisiana contractors from large multinational corporations coming into Louisiana and forcing the local companies to indemnify them and to add them as additional insurers. Lots of states do that. Have anti-indemnity acts? Yes, Judge, they do. Louisiana's is a bit broader than the one in Texas, I believe. And here, the act applies to, this is the critical language. I mean, it's not terribly exciting, but it does turn on the grammar of the statute. The act invalidates those indemnification and additional insurer provisions when they're contained in agreements pertaining to wells for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state. And fundamentally, the district court felt that it was bound by this court's decision back in 1992 in the transcontinental case, which interpreted the first portion of that language that I just quoted. And the court very directly said that in order for the act to apply, there had to be a well. However, and this is the point that I think Compass and the district court gloss over, in transcontinental, this court made clear that the second portion of the statutory language, drilling for minerals, was not an issue. And that's on page 990. Haven't Louisiana courts, including the Supreme Court, fought to know? Maybe over-interpreted that. And I'm sure you know, but the Supreme Court says, first, there must be an agreement that pertains to an oil, gas, or water well. I do think they're relying on transcontinental primarily for that. And most of these cases involve wells. Obviously, there are not a ton of salt mines in Louisiana. I think there are three. There are other minerals that are excavated and produced in Louisiana. But most of these Anti-Indemnity Act cases do come up in the oil and gas context. And there are wells. Let me ask you about a different part of Judge Weiner's opinion in transco. He starts his analysis by relying on the opening paragraph of the Act from 40 years ago. It says it's to amend a certain part of the current revised statutes to provide for the invalidity of certain indemnity agreements affecting industries engaged in the development, exploration, and exploitation of sources of energy. So he's not limiting it to well. Well, not he, Judge Weiner, but the legislature wasn't limiting it to oil and gas wells, but it was limiting it to energy. Does that have any play? Judge, I don't think it does. So that is in the preamble to the Act. And the Louisiana Supreme Court has made clear. I pulled it up this morning. I thought somebody might ask me about the preamble. In State versus Barbier, 1999, Louisiana Supreme Court, 743, Southern Second, 1236, it's a cardinal rule of statutory interpretation that the preamble is not part of the statute. So under Article 9, though, that's not part of it. We can't look to it as an illustration of what the statute is doing? Because part of Louisiana interpretation, as you know better than I, is to look for the intent of the legislature. Right, but under Article 9 of the Civil Code, you start with the text of the statute. And that's true in Louisiana. That's true under federal law. If the statute is clear and unambiguous, you cannot go beyond the text of the statute. And here, Compass does not argue that the statute is ambiguous. Judge Summerhays found that the statute was not ambiguous. We don't think the statute is ambiguous. It's a question of, how do you interpret it? That second clause, and we cited the Pumphrey decision, another Louisiana Supreme Court case that was analyzing completely separate statutory language, but language that used the exact same grammatical structure with a listing, a comma, a second or, and a second grammatical unit. And the Supreme Court made clear that those are separate grammatical units. And here, applying that grammatical interpretation, the word well refers to wells for oil, gas, or water. Texas makes it more explicit with the two. The Texas Act. But let's say you're right. It's not just a well requirement. There's also a drilling requirement. But it's drilling for minerals. Then don't we have to go down to subsection C and we see, well, it's not all operations involving drilling. It may not be just drilling a borehole for a blast. It's got to relate to structures and tunnels. And do you see where I'm going with that? I understand your question, Judge. So section C of the Act provides an illustrative list of certain types of agreements that would satisfy sections A and B. So it says, an agreement as it pertains to a well for oil, gas, or water, or drilling for minerals. So it repeats that. And then it lists operations that pertain to each. And which is the operation that you say is closest to drilling a borehole? I'm sorry. That's closest. Which operation that is listed as describing drilling for minerals is the closest to a drill and blast operation? So then this gets a little convoluted. There's another second or situation in section C. So it provides an illustrative list. It says, including but not limited to. So our initial point is that it doesn't even have to fall within here. If an agreement relates to drilling for minerals, it qualifies under section A. So I'll say that. But this illustrative list begins by saying, including but not limited to drilling, deepening, reworking, a number of other things, or otherwise rendering services in or in connection with a well, or excavating, constructing, improving, or otherwise rendering services in connection with any mine shaft, drift, or other structure intended for use in the exploration or production of any mineral. So our interpretation of section C is that it provides two illustrative lists of agreements that would relate to drilling. I understand. But the second list still requires relating to mine shafts, drifts, or structures. Or other structure intended for use. And so the mine, our position would be that the mine is a structure intended for use in the production of salt. But I thought the position you had been in was the drill bore to explode. I didn't understand your argument to be that the contracts here relate to shafts, and drifts, and structures. It's a borehole. Yeah, I think I may just be misunderstanding you. I think the structure, again, this illustrative list, I think is very broad. Otherwise, rendering services in connection with any other structure, I think our position would be that the mine itself, there are various structures that are part of the mine. In the record. What do we have in the summary judgment evidence that shows these agreements, these contracts, fire and electricity? Are you saying they didn't pertain to the drill for the blast, which is what I thought your argument about drilling was? But instead, it was the original building of the dome structure? It's the nexus I'm trying to probe for. I think the way we understand this, Judge, is that, well, let me take one step back. So two years after Transcontinental, you have Torres, which says that the act has to be interpreted broadly. And so the agreement under Section A must pertain to drilling for minerals. Torres was sulfur, so it's not a lone gas. No, that's right. And Torres didn't even talk about wells, which supports our interpretation that a well is not required under the drilling for minerals section. But we are rendering services. These two local Louisiana contractors are rendering services in connection with the production of salt. Obviously, electrical and fire safety technology is necessary as part of the operation. And so we think this falls within the otherwise rendering services at the mine where drilling for minerals occurs. I don't think the actual contracts have to be limited to the actual drilling. The act applies to any local contractor who is helping in the production of minerals, drilling for minerals. I hope that answers your question. I think that was the confusion. Was the question Judge Higginson asked addressed in the lower court? Was it discussed at all, the issue that was raised by Judge Higginson just now? Did the district judge talk about whether there was this connection between the contracts and drilling for minerals? I don't believe he does. It was several pages of analysis. And the district court really did feel constrained by transcontinental. And I think that's fundamentally the first issue this court has to decide. Did transcontinental establish a well requirement under the act generally or only under that first clause? And I think once you resolve that question, all that's left is, is COMPASS drilling for minerals at the mine? And we think that's a fairly simple question. They've had joint stipulations. They employ the drill and blast mining method. They're not using hand drills. They're using, their expert testified that they're using large machinery, drills mounted on jumbo machines and jack leg drilling. And that's an essential phase of the mining operation. I mean, this salt is not being produced without that drilling. But when Reland testifies, you agree there was no drill for a well. There's no well. That's right, Judge. So that's why I say it. And then he said, one thing we do, COMPASS does, is drill and blast. Separately, we have drilled, created the structure and the shafts and the drifts. Would you agree that was his testimony? Yes, that's right. There's some drilling initially. And I thought your position throughout had been that the act was triggered by virtue of the drill and blast. So when you say, we don't have to worry about limiting principle, not a little bit of a drilling, that's just a little drill. That would encompass a lot. A drill into the ground and then an explosion qualifies, triggers the act? I mean, it's an essential phase of the process. It may be an essential phase, but it may not be a described operation in subsection C. Well, again, I think subsection C is illustrative. So the fact that if your honors conclude that this particular operation is not covered, that's not dispositive. I think you're looking at whether it qualifies as drilling for minerals, generally, under A and B. But like I said before, that drill and blast is absolutely connected with the production of a mineral. It doesn't, Breland, their expert, testified that the salt does not get produced without drilling those holes for the explosives. Your interpretation basically requires an unlimited definition of what you call an illustrative list, but then sort of says, et cetera, after it. And it does seem to me the statutes are not read so open-endedly, that if you're trying to insert the activities that your client was doing here, it does seem to me that the illustrations have a role to play, and they're not irrelevant. So what would you say? I think you may have already responded, Judge Igginson, on this. What is the closest? We're not quite ready to say this is open-ended as you think it is, or want us to think it is. I don't know what you really think. What is the best one of those lists, which are talking about mine shafts, and drifts, and whatever, which makes it sound as if they're talking about creating that kind of mine. What's the closest thing your client is doing that would fit any of that? Again, Judge, I have to fall back on the language at the end of that second illustrative list. I was trying to let you leave the et cetera alone and give us something out of the illustration. I can't, because it doesn't, obviously, the electrical services and the fire suppression, they do not, they're not really analogous to the specific items in the list. Well, I'm not talking about your client. Maybe my question's not clear. I'm not talking about what your client does. I'm talking about what is being done to obtain the salt. Does any of that that's in the illustrative list fit with the drilling and blasting? I'm sorry to repeat myself. I have to fall back on the otherwise rendering services. OK. That's fine. That we need, I just want to make sure that that is indispensable to your argument. Well, it is. And then it goes on to say, or an agreement to perform any portion of any such work, or any act collateral thereto. So I recognize that that illustrative list  And those are the, those are the things that I'm going to be talking about. Those are the concepts that we fall under. Again, this act is meant to protect local Louisiana contractors. It's meant to be interpreted broadly. Here, COMPAS is arguing for a narrow interpretation of the act, a restrictive interpretation. And we think that doesn't further the public policy of the state in protecting these local contractors. And again, the holding in this case, once the court clarifies the transcontinental dealt with the first clause, and that a well is not always required when you're talking about drilling for minerals. Once that clarification is made, the only issue is whether the drill and blast mining method at this salt mine, the court can issue a very narrow ruling here to say that at this salt mine, where this drill and blast mining method is used, the act applies. And these local contractors who had no choice, if they wanted this work, they had no choice but to accept these purchase orders. That's in the record that both of the local companies issued declarations at page 922 and 997, saying that they had no choice but to accept these one-sided purchase orders that COMPAS issued to them. When you say we could write a short opinion relating to a salt, how would that be? Because wouldn't the opinion have to extend to any drilling and blasting that's occurring? Say quarries for rocks, their minerals. So if we were to say any contractor agreement that we're exploding to get minerals, that's a big exception from big oil companies that very well could have been Louisiana's intention. The evidence in this case deals with specifically this drill and blast method. I think the court could limit it to that. But to the extent that there is drilling going on as an essential phase of mining or excavating other minerals, the second clause of the statute covers that. The plain text of the statute would cover that. Now, you don't have to decide it because it could. When you say, just because time's up, but when you say good for you to have looked at the other states, can you think of any case from any other state that's been applied in a drill and blast context? We did not find other salt mine cases, but there are. Not even salt mine. Any drill and blast. I don't believe so, but this statute is much broader. The Louisiana Anti-Indemnity Act is much broader than that. Than Texas's? I believe it is. OK. Thank you. I've reserved my three minutes for that. Let me ask you a question. I waited until I didn't want to use your valuable time. This is purely of academic interest. It has nothing to do with the issue that we will decide. But for the last few decades, there's been confusion about what is the name of this act. Is it the Anti-Indemnity Act? Is it the Oilfield Indemnity Act? Or the district court here called it the Louisiana Oil Field Indemnification Act. I'd like for us to get it right for whatever opinion that we write and whoever wins or loses. What is the name of this act? I've been calling it, I like to call it the Anti-Indemnity Act because I don't particularly like that it has oil field in the title. But of course, the title is not relevant and we cited cases about that. It's the Louisiana Oilfield Anti-Indemnity Act, Judge. OK, so the district court got it wrong. OK. That's fine. Thank you very much. All right, Mr. Giannulli. Good morning, may it please the court. As much as I love this building, we tried to get out of it. We actually did file an abstention motion. And Judge Schmitt said maybe something should be decided by the Louisiana court, but it didn't work. So here we are. You did ask to certify the question. No, no. We asked the court to abstain based upon the abstention doctrine because this issue has to come up in the underlying case in state court. This all came from a wrongful death case by the electrician. We lost. That's why we're here. We tried. What do you think of the issue of the possibility of certifying now? I mean, it does seem to me. I think you could. I think it's not ambiguous, but to reach a result that the appellant doesn't like. So there seems to be some ambiguity to me inherent in this, particularly when you have the case law that we've been talking about. Obviously, Transco, to me, doesn't really cover this because of footnote 18. It says we weren't reaching this. So it's an open issue in our court, as far as I can tell. You can convince me otherwise. And I am concerned because of the limitations. If we say it applies here, and there are a number of reasons, you'll tell us why it doesn't. But nonetheless, if we would conclude it applies here, it seems to me it's opening a very broad application of this act, because mineral is an extraordinarily broadly defined, potentially defined word. And that, to me, is the real risk of this court deciding this, because we're deciding what mineral means under this act. And there's an awful lot of minerals that are drilled for in one way or another. I don't know if there's any question. The court's being asked to legislate, something that the Louisiana legislature has not done in 43 years. There have been 43 sessions of the legislature since this first act was passed in 80 by the Senate. And we went through with the district court, and it's in the record, the legislative history of this act, which, I mean, we dug out the Senate journals. Right, but the brief to us tried to say this has been decided in our transcontinental. But you would agree footnote 18 makes that argument impossible. I mean, I think transcontinental is certainly important, because it interprets the act the way the act is written. It has to relate to a will. And that's what this court said in transcontinental. But then, could you speak to footnote 18? Yeah, I agree. You agree it specifically says we aren't deciding the issue presented to us. Yes, of course, yeah. OK. Sure. And then just sticking with the statutory language, it doesn't grammatically make sense to have two ors. Subsection C defines the word agreement. Subsection B says what's invalid. So subsection C defines the word agreement. And every definition relates to a will. But subsection C makes the same bifurcation, will or drilling for minerals. But even that or relates to a will or a mine shaft. In this company, there is no will and there is no mine shaft. It's just a dome. This company is not in the word for. Remember, drilling for minerals. Well, there are men down in there that are, I think, the verb is mucking. So there's a big dime. It's not a laughing matter. I think the way I understand this dome works is you've got people in this huge structure that are taking the salt that's been blown up out. Why isn't that a pretty big structure? And presumably, the fire and the electricity had to do with that structure. The purchase orders, of course, they're working in the salt dome. So you can always say that anybody working in the dome relates to the mining. I mean, even the guy who fixes the television, you can say that. In this case, the district court stipulated, the district court specifically found that the quote, it is undisputed that the purchase orders issued here did not pertain to a will. Also, if you read the affidavit that we submitted, the only affidavit from the vice president of the company, the purchase orders had nothing to do with mining, had nothing to do with the mine shaft, and had nothing to do with exploration. So what did they pertain to down in there? Well, let me tell you, the electrician who died, he was replacing a line of lights in a trench. And the other fellow, the fire suppression FSS employee, for $2,100, he was checking the fire extinguishers. In the dome? Yes, sir, of course. Or in the trench? In the dome, yeah. We're in the dome, yeah, of course. So why aren't those passageways, drifts, and structures? Because they have nothing to do with mining. And the statute talks about mining, well, mine shaft, and exploring. I don't want to be sarcastic. They're not Christmas lights, right? They're presumably lighting up the mining operation. They're actually lighting up a line along a, that's the worst word for it, I'm trying to visualize it, a line along a pipe. Yeah, nothing to do with the salt. Remember, the drill and blast method, all the drill and blast method is, they make a big deal about drilling, is the guy takes a small drill, drills a hole into the wall, puts a stick of dynamite in, and blows it up. That's not, that's drilling. That's why the district court said, if we use QB's analysis, anybody with a drill to do anything, even repair a floor tile, is drilling for the purposes of the statute. That's not what the legislature said. I mean, the court found this statute unambiguous. I found it ambiguous. That's why we went through the legislative intent, and meticulously, starting from day one, proved to the court, and the court references it in the footnote, that the purpose is to regulate the oil and gas industry. This court's being asked to legislate an industry that's never been regulated. But am I right that in Torres, we've already gotten past it's only limited to oil? That was the- Right, right. But Torres, Torres is the drilling of a well to get to the salt. It is a well, but if you're gonna say this is just an oil industry, that argument can't survive Torres. Well, the legislature actually specifically removed the fresh process of sulfur from the statute. So, you go back to the meaning of the statute. What does the statute say? What does the Supreme Court say? The Supreme Court of Louisiana, in Rodrigue, let me, cited, said, the paltry interest of the state of Louisiana is to protect contractors involved in the oil fields from being forced to indemnity provisions to bear the risk of their principal's negligence, right? What case are you reading from? I'm reading from Rodrigue, citing Malloy v. Conoco. Rodrigue at 563, Southern 2nd and 248, citing the Supreme Court of Louisiana's Malloy case. But stand, both cases stand for the policy of the state, as stated by the legislature. And now the Supreme Court of Louisiana, that the policy interest of the state of Louisiana is to protect contractors involved in oil fields from being forced through indemnity provisions to bear the risk of their principal's negligence. This court actually quoted Rodrigue. The purpose is to protect certain contractors, namely those in oil fields. Well, counsel, maybe we were wrong, but we did say to the contrary in Torres, and this panel would be limited to that holding. It does seem to me that the title of the act, oil field, but then the language of the act, which talks about mines and minerals, are not in complete accord. And we are, and I do think the text of the statute will control over the title of the statute on Louisiana interpretive principles. So it seems to me, whatever the initial intent of this was, whatever the intent was when it got named, I at least accept, and you'd have to convince me otherwise, that this covers minerals that are not oil and gas, and may cover salt. So that's something we'll need to decide. So I would not think it's particularly productive for you to rely on this only being oil and gas coverage. Well, I mentioned that because the preamble to the original bill talks about sources of energy. It's undisputed in this case that salt is not a source of energy. It doesn't do anything. Doesn't burn, it doesn't heat or anything. So the purpose of the act, originally act, was to protect, to cover the exploration, exportation of sources of energy. Not this thing. Drilling for, the legislator specifically put the word for in there, and the district court looked at that. Drilling for means looking for, exploring. Compass is not in the business of looking for anything. It doesn't explore. When it bought this in the 60s, it was the dome. It was there. Have never done any exploration, have never laid a well or a shaft down. They chip it out, ship it out to the north to protect against the cold weather and the roads. Do you draw any support for your argument if we don't say there's a well requirement only? If we don't read it that way? The two are divisible. And could you then tell us how section C illuminates either your position? Or do you? The section, yeah, I put a clean copy of section C on the bench for you this morning. I mean, section C. I mean, if section C, if we assume there's a minerals clause as well as a well clause, do you lose or does section C mean that this is a term of art? Drilling for minerals is a term of art and it only encompasses certain operations? Absolutely. It only encompasses certain operations. It was made to do that. And again, when you read what the legislature wanted to do with this, it was only to include the oil and gas industry. Not an industry that produces, chips out salt. Remember, this is not, this court was replete with cases in the 70s and 80s where contractors were laid low by these general master servant agreements. Not the case. As the district court said here, these purchase orders were for the one time purchase order to replace a line and to replace the fire extinguishers. These have nothing to do with mining or explanation. And these contractors were not exploited like they were by the big oil companies. That's why the lawyer was passed. Because of the abuses back there. So what you're saying is even if the act extends beyond oil, as Torres said, and even if there isn't a well only requirement, still section C requires a nexus to the drilling and here the contracts don't have that pertaining to nexus. That's your argument? Yes, your honor. And that argument is supported by the legislative history. In this record, all the Senate journals that we quoted in the district court and we quoted selectively in this court in the brief. Yes, sir, absolutely. And how can, how can, counsel's argument is very unusual. Nice. The comma. How can a comma, which is what we're talking about, take precedence over the legislative intent which is clearly expressed in this bill? It exists. We know why. Lots of court cases at every level have gone off on commas, as you well know. Of course, yes sir. I mean, back on the nexus though, it would seem like it could be a fairly close nexus. If we accept that drilling for a mineral includes drilling in and blowing up salt, which is a mineral, then you need lighting to get out and you don't want to fire as you get it out. Well, if you say yeah, that's problematic. Well, I mean, that's why we suggested way back in the district court that it's something for the Supreme Court of Louisiana to decide, not this court. Because it legislates, you're legislating now in an entire industry based upon the use of a drill drilled a little hole in a wall to put explosives in. Not a well, not a shaft. This company doesn't explore for anything. Nothing like that. Let me ask you about the civil case. Is it still going on? And is this issue in that case? The civil case is still going on. Good question. The issue's been raised. In state court. And that issue has been raised in state court. Our issue has been raised in state court. Oh, sure. Yes, sir. What's the state of that litigation? Pending COVID. Everything died during COVID. So everything is nothing. COVID's coming back, so you may never get an answer. Well, hopefully COVID's never coming back, Judge. No, that's the status of it. It's sitting there. And that's one of the reasons why we follow the abstention doctrine. Whoa, maybe we should wait for this. But my argument is the same as what the district court found. The district court found there was no ambiguity. It was designed to cover an industry that's drilling for minerals. Salt is not a source of energy. That eliminates the purpose of the act. This company does not sink a well or a mine shaft. It simply chips out. And taking this argument to the extent craziness, even a hand drill is enough to include this industry in an act that was clearly designed, and according to the legislature, for the oil and gas industry to protect interests there that are not here. It's just not here. All right, thank you, Mr. Jones. Thank you, Your Honor. Rebuttal? Your Honor, first of all, Judge Southwick, in the state court case, this issue of the application of the Anti-Indemnity Act is not presented. It seemed like it might be presented after judgment, or something. I was wondering if it would be in the tort case itself. Well, that was the dispute on the abstention motion here in federal court. And what we argued is once it's decided here, it will control that case. If COMPAS is found not negligent, they could potentially be entitled to defense costs under Malloy. But deciding the issue here will render it moot. It will never come up in the state court case. And it's not currently pending. I didn't want there to be a suggestion that there's sort of a race between federal court and state court on this Anti-Indemnity Act issue. That's not the case. We've presented it here, and the federal court has denied the abstention motion, and went ahead and decided the issue. Judge Higginson, I think you're right on at the end there with the nexus being connected to the actual production of salt. And I again go back to Torres. The injury in Torres, well, two things about Torres. The contract in Torres that contained the clauses that were invalidated was a contract to hook up electrical instrument systems. It was an electrical contract, very similar to the purchase order to MCE in this case. And the plaintiff who was injured in that case was working on a platform where drilling was not occurring. He was on other portions of the sulfur drilling platform, a portion that was under construction. And he tripped while carrying a box of electrical equipment. But still the nexus, he's on the platform, he's helping the overall operation, and that's the position. That's our argument here. There's absolutely a nexus when the drilling, when the mining company is using more than a hand drill. I mean, that's- Opposing counsel is now saying, well, maybe certify. Well, yeah, I would be too, frankly. Well, but would you be yourself? Because you're still asking for us to announce a rule that no court in any state with this similar language, and I do think Texas is pretty similar, but I'll look again because you say it's not. No court, and then we do have a Louisiana Supreme Court that embraces our first part of transcontinental that would suggest a well requirement. So it would be quite an expansion to all other mineral drilling of any type of drilling. So the court made clear in Torres that the act is not limited to oil and gas. It's been almost 40 years, and the legislature has not come back to amend the act pursuant to its preamble or its- All minerals, not just energy producing ones, but still all forms of drilling. It says drilling for minerals that are in a solid, liquid, or gaseous state, which again comes back, there are a lot of minerals that are in a solid state. There can be no well if you're drilling for a solid mineral. That's just, it doesn't make sense. But my point on the nexus is if you go back and look at Torres, I think that answers your question there. It does not have to, the contract itself does not have to be directly related to the drilling. It has to be part of the overall operation. So we would ask the court to reverse the ruling below and render judgment in our favor. Thank you, Mr. Grebo. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.